**Labaton Sucharow LLP**
Eric J. Belfi
Francis P. McConville
Joseph N. Cotilletta
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
ebelfi@labaton.com
fmcconville@labaton.com
jcotilletta@labaton.com

*Counsel for Plaintiff*

UNDERLINE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CITY OF WARWICK RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>CATALENT, INC., JOHN CHIMINSKI, ALESSANDRO MASELLI, and THOMAS CASTELLANO,<br><br>        Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff City of Warwick Retirement System ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and

Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' (as defined herein) public documents, conference calls and announcements made by Defendants, public filings, wire and press releases published by and regarding Catalent, Inc. ("Catalent," or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of a "Class" of all persons or entities who purchased or otherwise acquired Catalent securities between August 30, 2021 and October 31, 2022, inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      This case is about the rise and fall of a company that *initially* benefited from the COVID-19 pandemic (also referred to herein as "COVID-19," "COVID," or the "pandemic").  As a vaccine manufacturer, Catalent was one of the beneficiaries of COVID because it seemed well positioned to capitalize on the rapidly growing demand for vaccine production capacity.  Indeed, Catalent almost doubled its business during the first year of the pandemic when the bulk of

vaccines were administered.  Catalent's success during the early stages of the pandemic caused its stock price to soar to record highs.  By mid-2021, when COVID-related work dropped off, Defendants engaged in accounting and channel stuffing schemes to pad the Company's revenues.  These schemes gave Catalent the appearance of continued growth, causing its stock price to reach new record highs.  Meanwhile, to support these schemes and keep pace with its lofty growth targets, Catalent was cutting corners on safety and control procedures at key production facilities.  By late 2022, Catalent reported significant sales declines and excess inventory throughout its supply chain.  As a result, Catalent stock dropped to pre-COVID levels causing substantial losses to its investors as they learned that Catalent's early-COVID revenues were never sustainable, and its Class Period revenues were the product of securities fraud.

3.      By way of background, Catalent is a multinational corporation that manufactures and packages drugs into delivery devices fit for human consumption (*i.e.*, pre-filled syringes, vials, pills, etc.) pursuant to long-term supply contracts with pharmaceutical companies.  Catalent directly sells these products to pharmaceutical companies which later sell them through the supply chain to healthcare providers (*i.e.*, hospitals, clinics, etc.), which administer them to patients, who are the end consumers.

4.      Prior to the onset of the pandemic, Catalent's quarterly revenue averaged approximately $669 million between April 2018 and March 2020. During the period that those revenues were reported to the market, Catalent stock had an average closing price of approximately $47.57 per share.  In early 2020, Catalent took on numerous large-scale COVID projects, including filling vaccines into syringes for Moderna and AstraZeneca.  Those projects catapulted the Company's quarterly revenues to record highs, which averaged approximately $940 million between April 2020 and March 2021, a ***40 percent jump*** over pre-COVID revenues.  Over the period when that revenue surge was reported to the market, Catalent stock had an average closing price of $102.42 per share.

5.      By mid-2021, as the pandemic wore on, demand for Catalent's COVID products decreased because vaccinations had already been administered to a large number of potential patients.  For example, Centers for Disease Control and Prevention ("CDC") data indicates that COVID vaccinations in the United States reached an all-time high of 4.5 million doses on April 1, 2021,[1] and averaged 1.5 million daily doses between December 14, 2020 and August 28, 2021.  By comparison, CDC data indicates that average daily vaccinations in the United States were under 625,000 during the Class Period.

---

[1]  All vaccination date cites Edouard Mathieu et al., *A global database of COVID-19 vaccinations*, 5 NAT HUM BEHAV (2021).

6.      Despite this marked decline in the demand for COVID vaccines, Catalent continued to report growing revenues and assured investors that customer demand remained strong during the Class Period.  The average quarterly revenue reported during the Class Period was $1.2 billion, an *80 percent increase* over pre-COVID-19 revenues and a *28 percent increase* over its reported revenues for the first year of the pandemic.  Unbeknownst to investors, Defendants artificially inflated these revenues through fraudulent accounting and channel stuffing schemes to mislead investors into believing that Catalent was generating sustainable revenue growth.  Defendants' fraud caused Catalent stock to trade at a record high of $142.64 per share on September 9, 2021 and an average closing price of approximately $108.00 per share during the Class Period.

7.      Statements made by Defendants throughout the Class Period were materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

> a.   Catalent materially overstated its revenue and earnings by prematurely recognizing revenue in violation of U.S. Generally Accepted Accounting Principles ("GAAP");
>
> b.   Catalent had material weaknesses in its internal control over financial reporting related to revenue recognition;

c.   Catalent falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end consumers;

d.   Catalent disregarded regulatory rules at key production facilities in order to rapidly produce excess inventory that was used to pad the Company's financial results through premature revenue recognition in violation of GAAP and/or stuffing its direct customers with this excess inventory; and

e.   As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's financial performance, outlook, and regulatory compliance during the Class Period.

8.   Catalent's misrepresentations were first revealed to the market on August 29, 2022, when the Company disclosed that demand for its COVID-related products was facing substantial headwinds.  On this news, Catalent's stock price *declined by 7.4 percent* to close at $92.28 per share on August 29, 2022.

9.   Then, on September 20, 2022, a *Washington Post* report exposed that the release of COVID-19 vaccines produced by Catalent had been delayed by regulators because of improper sterilization at one of Catalent's key facilities.  On

this news, Catalent's stock price *declined by 9.3 percent* over two trading sessions, to close at $79.06 per share on September 22, 2022.

10.     On November 1, 2022, Catalent revealed that its quarterly earnings had declined to *zero* and lowered its financial guidance, indicating falling demand. The Company also disclosed that regulatory issues at its key facilities were negatively impacting its financial results.  On this news, Catalent's stock price *declined by 31.7 percent* over two trading sessions, to close at $44.90 per share on November 2, 2022.   All told, over the course of the Class period, Catalent stock fell from a high above $142.00 to close at $44.90 on November 2, 2022, *a more than 68 percent decline*.

11.     On November 16, 2022, Catalent revealed that it was carrying approximately $400 million in excess inventory, further revealing that the Company had misrepresented demand for its products as well as its purported ability to predict future demand.  On this news, Catalent's stock price *declined by 8.5 percent*, over two trading sessions, to close at $42.07 per share on November 17, 2022.

12.     Then, on December 8, 2022, GlassHouse Research published a report claiming that Catalent had been materially overstating its revenues by $568.2 million in violation of GAAP.  The report detailed numerous red flags that were indicative of Catalent's improper accounting practices.  These red flags included

the rapid increase in Catalent's contract asset and inventory balances, declining customer deposits, executive turnover, and recent scrutiny of the Company's revenue accounting by regulators.  The report also described how Catalent's direct customers were stuffed with excess inventory which "will take years to unwind." On this news, Catalent's stock price ***declined 3.6 percent*** to close at $45.54 per share on December 8, 2022.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Catalent securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa) as the alleged misstatements and the subsequent damages took place in this judicial district and Catalent is headquartered in this Judicial District.

17.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

18.     Plaintiff, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Catalent securities during the Class Period and was damaged as the result of Defendants' wrongdoing alleged in this complaint.

19.     Defendant Catalent provides development and manufacturing solutions for drugs, protein-based biologics, cell and gene therapies, vaccines, and consumer health products at its over fifty facilities around the globe.  Catalent is incorporated in Delaware and its principal executive office is located at 14 Schoolhouse Road, Somerset, New Jersey, 08873.  Catalent's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CTLT."

20.     Defendant John Chiminski ("Chiminski") is the current Executive Chair of the Board of Catalent and previously served as the Company's Chief Executive Officer ("CEO") from the beginning of the Class Period until July 1, 2022.

21.     Defendant Alessandro Maselli ("Maselli") serves as the Company's current CEO and President effective July 1, 2022 and prior to that served as the Company's President and Chief Operating Officer ("COO") from the beginning of the Class Period.

22.     Defendant Thomas Castellano ("Castellano") served as the Company's Chief Financial Officer ("CFO") and Senior Vice President throughout the Class Period.

23.     Defendants Chiminski, Maselli, and Castellano are sometimes collectively, in whole or in part, referred to herein as the "Individual Defendants."

24.     The Individual Defendants possessed the power and authority to control the contents of Catalent's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Catalent's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Catalent, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The

Individual Defendants are liable for the false statements and omissions pleaded herein.

25.    The Company and the Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Company Overview and Background Prior to the Pandemic

26.    Catalent is a contract development and manufacturing organization (CDMO) which provides drug development and manufacturing solutions at its more than fifty facilities across the globe.  Many of the services Catalent provides involve delivery technologies for various drugs, such as pre-filled syringes and vials.

27.    Catalent conducts its business through two segments: (1) Biologics; and (2) Pharma and Consumer Health ("PCH").  The Biologics segment provides manufacturing and other services for treatments developed from blood, proteins, virus, and living organism, including COVID-19 treatments.  Among other things, the PCH segment mass produces pills and gummies.  Each segment generates about half of Catalent's total revenue.

28.    Patients are the end consumers of medical products for which Catalent provides manufacturing and development services.  However, Catalent's direct

customers, or "channel partners" are typically pharmaceutical companies.  Catalent provides manufacturing services for these channel partners, such as filling syringes with the channel partners' vaccines, which get packaged and shipped to the channel partners.  The channel partners ultimately distribute these products to healthcare providers.  Some of Catalent's key channel partners include AstraZeneca, Bristol-Myers Squibb, GlaxoSmithKline, Johnson & Johnson, Moderna, and Pfizer.  Catalent has long-term agreements with these channel partners to continuously supply them with inventory.  These close relationships give the Company strong visibility into the needs of its channel partners, particularly what level of inventory the channel partners will need to serve the demand of end consumers.

29.     These long-term contracts with channel partners also dictate, in part, the benchmarks that Catalent must meet in order to recognize revenue.  Under GAAP, Catalent is required to recognize revenue on its long-term agreements with its channel partners once the Company meets certain objective milestones (*i.e.*, products successfully passing quality inspection).  Because Catalent recognizes a significant portion of this revenue *prior to* billing its customers, which reduces third-party transparency, these contracts are highly susceptible to accounting fraud through premature revenue recognition.

30.     Between April 2018 and March 2020, prior to any COVID-related projects, Catalent's quarterly revenue averaged $669 million.  During the period that these revenues were reported to the market, Catalent stock had an average closing price of $47.57 per share.

### COVID Projects Drive Massive Growth at Catalent

31.     Much of Catalent's rapid growth since 2020, particularly in its Biologics segment, was attributed to its sale of COVID-related products.  In fact, Catalent was awarded work on more than one hundred COVID-related products by more than sixty clients.  These projects included filling COVID vaccines into syringes for channel partners such as Moderna and AstraZeneca.

32.     As Catalent was taking on these projects, it was expanding its facilities to meet the accelerating demand for COVID-related drugs.  Meanwhile, Defendants provided the market with very strong revenue guidance while touting the Company's ability to gauge customer demand.

33.     The COVID-19 related projects propelled the Company's quarterly revenues to record highs, which averaged $940 million between April 2020 and March 2021, a ***40 percent jump*** over pre-COVID revenues.  During the period that this revenue surge was reported to the market, Catalent stock had an average closing price of $102.42 per share.

**The FDA Identifies Major Issues at Catalent Production Facilities**

34.     This rapid expansion of production activity led to serious problems at important Catalent facilities.  Catalent's key production facilities include a plant in Bloomington, Indiana which provides drug product filling and finishing services (the "Bloomington Facility") and a syringe filling facility in Brussels, Belgium (the "Brussels Facility").  Both the Bloomington Facility and the Brussels Facility are required to abide by Current Good Manufacturing Practices ("CGMP"), quality control and safety regulations that are enforced by the U.S. Food and Drug Administration (the "FDA").

35.     During the Class Period, Catalent received at least three Form 483s from the FDA.  The FDA issues a Form 483 to firm management at the conclusion of an inspection when the FDA has observed any conditions that may constitute statutory violations under the FDA's purview, including CGMP violations.  Such violations include conditions or practices indicating that any drug or device has been adulterated or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health.

36.     The FDA conducted an inspection from October 18, 2021 to October 26, 2021 at the Brussels Facility.  On October 26, 2021, the FDA issued a Form 483 pursuant to this inspection stating it had found several infractions including

14

faulty air filtration systems, alarming bacterial growth, and subpar equipment maintenance.

37.     The FDA conducted the second relevant inspection at the Bloomington Facility from August 1, 2022 to September 1, 2022.  On September 1, 2022, the FDA issued a Form 483 pursuant to this inspection which identified several problems at the facility including finding foreign matter, particular matter, and foreign objects and pieces in vials produced at the facility, as well as control procedure problems.

38.     The FDA conducted the third relevant inspection, again at the Brussels Facility, from August 10, 2022 to August 19, 2022.  On August 19, 2022, the FDA issued another Form 483 detailing problems with air filters and other equipment-related issues at the Brussels Facility.

**Defendants' Materially False and Misleading Statements**

39.     On August 30, 2021, the first day of the Class Period, the Company filed with the SEC its annual report for its fiscal year that ended on June 30, 2021 (the "2021 10-K") signed by Defendants Chiminski and Castellano.  The 2021 10-K reported that Catalent generated $3.998 billion in net revenue and $585 million in net earnings for the fiscal year ended June 30, 2021.  Also on August 30, 2021, the Company issued a press release announcing its results for the fiscal quarter that

ended on June 30, 2021.  According to the press release Catalent generated $1.188

billion in net revenue and $182 million in net earnings.

40.     The 2021 10-K stated that Catalent "provide[s] differentiated

development and manufacturing solutions for drugs, protein-based biologics, cell

and gene therapies, and consumer health products at over fifty facilities across four

continents **under rigorous quality and operational standards.**"[2]

41.     The 2021 10-K further stated that:

> *We operate our plants in accordance with current good manufacturing practices ("cGMP") or other applicable requirements*, following our own high standards that are consistent with those of many of our large global pharmaceutical and biotechnology customers. We have approximately 1,600 employees around the globe focused on quality and regulatory compliance . . . . *We believe our quality and regulatory track record to be a favorable competitive differentiator.*

42.     Appended as exhibits to the 2021 10-K were signed certifications

pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendant

Chiminski and Defendant Castellano certified that "[t]he [2021 10-K] fully

complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]"

and that "[t]he information contained in the [2021 10-K] fairly presents, in all

material respects, the financial condition and results of operations of the

Company."

---

[2] Emphasis added unless otherwise stated.

43.     Also on August 30, 2021, Catalent hosted an earnings call for its fiscal

quarter that ended on June 30, 2021 (the "Q4 2021 Earnings Call").  During the Q4

2021 Earnings Call, Defendant Chiminski stated that the Company saw "*vaccines*

*for COVID specifically being really much more of a sustaining and an enduring*

*revenue for Catalent.*"  He also stated that Catalent's outlook was that "*vaccines*

*[would continue] to play a strong role into the future without any, I would say,*

*substantial cliff* in terms of the business since we'll be dovetailing in some of our

strong pipeline along with the continued sustained supply required for the COVID

vaccine."

44.     On November 2, 2021, the Company filed with the SEC its quarterly

report for its fiscal quarter that ended on September 30, 2021 (the "Q1 2022 10-

Q").  The Q1 2022 10-Q reported that Catalent generated $1.025 billion in net

revenue and $93 million in net earnings for the quarter.

45.     Appended as exhibits to the Q1 2022 10-Q were signed certifications

pursuant to SOX, wherein Defendant Chiminski and Defendant Castellano

certified that "[t]he [Q1 2022 10-Q] fully complies with the requirements of

Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information

contained in the [Q1 2022 10-Q] fairly presents, in all material respects, the

financial condition and results of operations of the Company."

46.     Also on November 2, 2021, the Company hosted an earnings call for its fiscal quarter that ended on September 30, 2021 (the "Q1 2022 Earnings Call"). During the Q1 2022 Earnings Call, Defendant Castellano stated that:

> *[The Company continues] to see COVID demand as having a multiyear duration*. We're still in the very early stages in terms of worldwide vaccine populations and what we're seeing from a booster demand perspective as well as younger age populations get approved for the vaccine, et cetera, continue to give us *confidence that this is going to be around for a multiyear duration, including into the fiscal '23 year.*

47.     On the Q1 2022 Earnings Call, Defendant Chiminski commented on Catalent's ability to gauge demand for some of its key non-COVID-related products.  Specifically, he stated that the Company had increased "*visibility to the customer demand* and needs of that business."  Defendant Chiminski further stated that the Biologics segment was "*driven by continued high demand from COVID-19 projects* . . . again the top contributor to Catalent's financial performance," and that "robust net revenue growth was organic and was driven by high demand for drug product and drug substance offerings in the U.S. and Europe, *most notably for COVID-19 related programs*."

48.     On January 10, 2022, speaking at the JPMorgan Healthcare Conference, Defendant Chiminski stated that the Company had visibility into "*continuing demand [for vaccines] into [2023]*" and that vaccines were "an enduring franchise for Catalent."

18

49.     On February 1, 2022, the Company filed with the SEC its quarterly report for the fiscal quarter that ended on December 31, 2021 (the "Q2 2022 10-Q"). The Q2 2022 10-Q reported that Catalent generated $1.217 billion in net revenue and $97 million in net earnings for that quarter.

50.     Appended as exhibits to the Q2 2022 10-Q were signed certifications pursuant to SOX, wherein Defendant Chiminski and Defendant Castellano certified that "[t]he [Q2 2022 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q2 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

51.     Also on February 1, 2022, Catalent hosted an earnings call for its fiscal quarter that ended on March 31, 2022 (the "Q2 2022 Earnings Call"). During the Q2 2022 Earnings Call, Defendant Maselli claimed that Catalent's "***long-term strategic plan does not assume that the pandemic-related demand for vaccines will continue in [future] years.***" Defendant Maselli also stated that he believed Catalent has "always been very, very ***thorough in collaboration with all the regulatory agencies.***"

52.     On May 3, 2022, the Company filed with the SEC its quarterly report for its fiscal quarter that ended on March 31, 2022 (the "Q3 2022 10-Q"). The Q3

19

2022 10-Q reported that Catalent generated $1.273 billion in net revenue and $141 million in net earnings for the three-month period ending March 31, 2022.

53.     Appended as exhibits to the Q3 2022 10-Q were signed certifications pursuant to SOX, wherein Defendant Chiminski and Defendant Castellano certified that "[t]he [Q3 2022 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [Q3 2022 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

54.     Also on May 3, 2022, the Company hosted an earnings call for its fiscal quarter that ended on March 31, 2022 (the "Q3 2022 Earnings Call"). During the Q3 2022 Earnings Call, Defendant Chiminski stated that *"[d]emand remain[s] strong in [the Biologics] segment*, including a notable increase from several of our large gene therapy customers for viral vector manufacturing." He also noted that the Company "project[ed] . . . *continued demand in the years ahead.*"

55.     Further, on the Q3 2022 Earnings Call, Defendant Castellano stated, in response to a question asking if Catalent was seeing its customers build stockpiles in the products Catalent provides, "*I'm certainly not hearing or seeing that* . . . *[N]ot something I'm seeing or hearing across the business.*" Responding to the same question, Defendant Maselli stated *"[W]e are not seeing that*

*happening across the board. I believe that this is also due to the fact that many areas, at the end, the demand of the market is really strong*. So we are now refocusing on making sure that the market is served with all capacity that we are deploying **in those high-demand areas**."

56.    During the Q3 2022 Earnings Call, Defendant Castellano also stated, in response to a question regarding the decline in Catelent's COVID-19 business, that the Company had "considerably derisked the overall contributions here . . . as part of the fiscal '23 and **continue to have a line of sight to growth despite that declining demand profile of COVID-related vaccine revenue** to the 8% to 10% long-term growth target that we have in place for the consolidated company."

57.    The statements contained in ¶¶ 39-56 were materially false and/or misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

> a.    Catalent materially overstated its revenue and earnings by prematurely recognizing revenue in violation of U.S. GAAP;

b.   Catalent had material weaknesses in its internal control over financial reporting related to revenue recognition;

c.   Catalent falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end consumers;

d.   Catalent disregarded regulatory rules at key production facilities in order to rapidly produce excess inventory that was used to pad the Company's financial results through premature revenue recognition in violation of GAAP and/or stuffing its direct customers with this excess inventory; and

e.   As a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's financial performance, outlook, and regulatory compliance during the Class Period.

**The Truth Begins to Emerge**

58.   The truth behind Defendants' misrepresentations began to emerge on August 29, 2022, when the Company disclosed its financial results for its fiscal year that ended on June 30, 2022.  The Company revealed that despite its repeated representations regarding sustained demand for its products and services, it

reported sales that fell below consensus expectations because demand for its COVID-related products and services was facing substantial headwinds.  In response to this disclosure, Catalent stock *dropped $7.42 per share, or 7.4 percent*, to close at $92.28 per share on August 29, 2022.

59.     Despite this news, Defendants continued to issue false and misleading statements related to the Company's revenue and earnings, demand for its products, and quality control at its key facilities.  On August 29, 2022, the Company filed with the SEC its annual report for its fiscal year that ended on June 30, 2022 (the "2022 10-K"), which was signed by Defendants.  The 2022 10-K reported that Catalent generated $4.828 billion in net revenue and $519 million in net earnings for the fiscal year ending June 30, 2022.  Also on August 29, 2022, the Company announced its fiscal results for its fiscal quarter that ended on June 30, 2022, reporting that Catalent generated $1.313 billion in net revenue and $188 million in net earnings.

60.     The 2022 10-K also stated:

> *We operate our plants in accordance with current good manufacturing practices ("cGMP") or other applicable requirements*, following our own high standards that are consistent with those of many of our large global pharmaceutical and biotechnology customers. We have approximately 1,900 employees around the globe focused on quality and regulatory compliance . . . . *We believe our quality and regulatory track record to be a favorable competitive differentiator*.

61.     Appended as exhibits to the 2022 10-K were signed certifications pursuant to SOX, wherein Defendant Maselli and Defendant Castellano certified that "[t]he [2022 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

62.     On August 29, 2022, the Company hosted an earnings call for its fiscal quarter that ended on June 30, 2022 (the "Q4 2022 Earnings Call").  During the Q4 2022 Earnings Call, Defendant Maselli stated that the Company had "***much better visibility***" on demand for its COVID-related products and services. Defendant Maselli also stated on the Q4 2022 Earnings Call that Catalent had "***pretty [good] visibility***" of its prescription business and that the prescription business' pipeline was strong.  Further, Defendant Maselli stated that the Company expected its growth to be "driven by [its] non-COVID business."

63.     Defendant Maselli further claimed on the Q4 2022 Earnings Call that Catalent's "***growth was primarily driven by broad demand for our biologics offering***, including the demand for COVID-19-related products, increased demand for our customer prescription products, and a rebound in demand for our consumer health products."  Thus, Defendants represented that the Company was seeing

24

sustained demand for many of its products, including products unrelated to COVID.

64.     The statements contained in ¶¶ 59-63 were materially false and/or misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

   a.   Catalent materially overstated its revenue and earnings by prematurely recognizing revenue in violation of U.S. GAAP;

   b.   Catalent had material weaknesses in its internal control over financial reporting related to revenue recognition;

   c.   Catalent falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end consumers;

   d.   Catalent disregarded regulatory rules at key production facilities in order to rapidly produce excess inventory that was used to pad the Company's financial results through premature revenue recognition in violation of GAAP

and/or stuffing its direct customers with this excess

inventory; and

e.    As a result of the foregoing, Defendants lacked a

reasonable basis for their positive statements about the

Company's financial performance, outlook, and regulatory

compliance during the Class Period.

65.    The truth behind Catalent's representations about its compliance with

CGMP began to come to light on September 20, 2022, when the *Washington Post*

released an article, after the close of trading, entitled "FDA releasing millions of

Moderna boosters as states warn of shortages."  According to that article, the FDA

had delayed the release of millions of COVID-19 vaccine booster shots filled by

Catalent as a result of their inspection of the Bloomington Facility.  FDA officials

had raised concerns that vaccine vials packaged at the Bloomington facility could

be contaminated because the facility was not sufficiently sterile.  On this news,

Catalent's stock price ***declined by 9.3 percent*** over two trading sessions, to close at

$79.06 per share on September 22, 2022.  However, the full extent of the losses

Catalent would suffer from cutting corners at key facilities was not yet revealed.

66.    Defendants' misrepresentations were further revealed on November 1,

2022, when Catalent reported its financial results for its fiscal quarter that ended on

September 30, 2022.  For that quarter, the Company disclosed that its ***earnings***

*had fallen to zero* and lowered its fiscal year 2023 revenue guidance to the range of $4.625 to $4.875 billion from $4.975 billion to $5.225 billion.  The earnings miss and revised guidance revealed that demand for Catalent products and services was much weaker than the Company had touted.

67.     These revelations came as a shock to the investing public, particularly because they contradicted Catalent's consistent claims of high visibility into customer demand for its products, and therefore a strong ability to predict future revenue.  In reaction to this news, Barclays analyst Luke Sergott wrote: "It is really hard to gain comfort in a business that suddenly turns negative on the macro in a matter of a few weeks when it is supposed to be long-cycle and have high visibility.  Especially when the guide was supposedly set conservatively to start the year. . . .  Overall, this was a very hard quarter to stomach after recommending the stock for so long."

68.     Also on November 1, 2022, the Company hosted an earnings call for its fiscal quarter that ended on September 30, 2022 (the "Q1 2023 Earnings Call").  On the Q1 2023 Earnings Call, Defendant Maselli stated that the Company was anticipating "*negative P&L [profit and loss] effects*," as Catalent attempted to address the FDA's observations of regulatory violations.

69.     On this news, Catalent's stock price *declined by 31.7 percent* over two trading sessions, to close at $44.90 per share on November 2, 2022.

70.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## Post-Class Period Revelations

71.     Defendants' misrepresentations continued to come to light after the Class Period.

72.     Defendants' misrepresentations regarding its visibility into demand were further revealed on November 16, 2022 when, at the Stephens Investment Conference, Defendant Castellano disclosed that Catalent's "inventory levels . . . in the month of September for the Q1 close were higher than they've ever been before in excess of $700 million. . . . . [*W]e're probably about $400 million too high right now*." On this news, Catalent's stock price *declined by 8.5 percent*, over two trading sessions, to close at $42.07 per share on November 17, 2022.

73.     The truth behind Defendants' repeated misrepresentations was further revealed on December 8, 2022 when GlassHouse, LLC, a stock analyst firm, released a report entitled "Accounting Red Flags Plague Catalent, Inc." (the "GlassHouse Report"). The Catalent Report more fully revealed two methods used by Defendants to artificially inflate Catalent's reported revenues and misstate its true customer demand.

28

74.     First, the GlassHouse Report provided evidence supporting the claim that Catalent had overstated its revenues by more than $568 million during the Class Period through premature revenue recognition in violation of GAAP. According to the GlassHouse Report, this overstated revenue related to product that the Company had produced but had not yet billed to its customers.

75.     Second, the GlassHouse Report asserted that Catalent had engaged in channel stuffing, a deceptive practice whereby the Company knowingly sold more product to its direct customers that they could sell through to their respective customers.  Through this practice, Catalent was able to paint a misleading picture of continued revenue growth and sustainable customer demand to its investors.

76.     The GlassHouse Report listed numerous red flags that reveal Catalent's deceptive accounting and channel stuffing schemes including the rapid increase in Catalent's contract asset and inventory balances, declining customer deposits, executive turnover, and recent scrutiny of the Company's revenue accounting by regulators.

77.     Following the publication of the GlassHouse Report, Catalent's stock price ***declined 3.6 percent*** to close at $45.54 per share on December 8, 2022.

## ADDITIONAL SCIENTER ALLEGATIONS

78.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to

29

whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

79.    The Individual Defendants permitted Catalent to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

80.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Catalent, their control over, receipt, and/or modification of Catalent's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Catalent, participated in the fraudulent scheme alleged herein.

81.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Catalent securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding Catalent's business, operations, and management and the intrinsic

value of Catalent securities and caused Plaintiff and members of the Class to purchase Catalent securities at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

82.     During the Class Period, as detailed herein, Catalent and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Catalent securities, and operated as a fraud or deceit on Class Period purchasers of Catalent securities by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Catalent securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of Catalent securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

83.     To the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

84.     Further, Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Catalent securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

85.     At all relevant times, the market for Catalent securities was efficient for the following reasons, among others:

(a)     as a regulated issuer, Catalent filed periodic public reports with the SEC;

(b)     Catalent regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other

wide-ranging public disclosures, such as communications with the financial press,
securities analysts, and other similar reporting services;

      (c)    Catalent was followed by several securities analysts employed
by major brokerage firm(s) who wrote reports that were distributed to the sales
force and certain customers of their respective brokerage firm(s) and that were
publicly available and entered the public marketplace; and

      (d)    Catalent securities were actively traded on the NYSE.

86.    As a result of the foregoing, the market for Catalent securities
promptly digested current information regarding Catalent from all publicly
available sources and reflected such information in Catalent's price.  Under these
circumstances, all purchasers of Catalent securities during the Class Period
suffered similar injury through their purchase at artificially inflated prices and the
presumption of reliance applies.

## NO SAFE HARBOR

87.    The statutory safe harbor provided for forward-looking statements
under certain circumstances does not apply to any of the allegedly false statements
pleaded in this Complaint.  The statements alleged to be false and misleading
herein all relate to then-existing facts and conditions.  In addition, to the extent
certain of the statements alleged to be false may be characterized as forward
looking, they were not identified as "forward-looking statements" when made and

there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Catalent who knew that the statement was false when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class consisting of all persons other than defendants who acquired Catalent securities publicly traded on the NYSE during the Class Period, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

89.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Catalent securities were actively traded on the NYSE.  While the exact number of Class members is

unknown to Plaintiff at this time and can be ascertained only through appropriate

discovery, Plaintiff believes that there are hundreds, if not thousands of members

in the proposed Class.

90.    Plaintiff's claims are typical of the claims of the members of the Class

as all members of the Class are similarly affected by Defendants' wrongful

conduct in violation of federal law that is complained of herein.

91.    Plaintiff will fairly and adequately protect the interests of the

members of the Class and has retained counsel competent and experienced in class

and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with

those of the Class.

92.    Common questions of law and fact exist as to all members of the

Class and predominate over any questions solely affecting individual members of

the Class.  Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of Catalent securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5
### Promulgated Thereunder Against All Defendants

94.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

95.     This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

96.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

98.     Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the

Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

99.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Catalent personnel to members of the investing public, including Plaintiff and the Class.

100.   As a result of the foregoing, the market price of Catalent securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Catalent securities during the Class Period in purchasing Catalent securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

101.   Had Plaintiff and the other members of the Class been aware that the market price of Catalent securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which

Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

102.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

103.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Catalent securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

104.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.  Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

106.   As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's

financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

107.   Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

108.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: February 24, 2023        **Labaton Sucharow LLP**

/s/ Joseph N. Cotilletta (047092011)
Eric J. Belfi
Francis P. McConville
Joseph N. Cotilletta (047092011)
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
ebelfi@labaton.com
fmcconville@labaton.com
jcotilletta@labaton.com
*Counsel for Plaintiff*