**CARELLA BYRNE CECCHI BRODY & AGNELLO, PC**
James E. Cecchi
5 Becker Farm Road
Roseland, NJ 07068-1739
Telephone: (973) 994-1700

*Liaison Counsel for the Proposed Settlement Class*

**LABATON KELLER SUCHAROW LLP**
Christine M. Fox (*pro hac vice*)
Adam Federer (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Matthew L. Mustokoff (*pro hac vice)*
Joshua E. D'Ancona
Jamie M. McCall (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706

*Co-Lead Counsel for Lead Plaintiffs SEB Funds AB and Public Employees' Retirement System of Mississippi, and Proposed Settlement Class*

*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CITY OF WARWICK RETIREMENT SYSTEM, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CATALENT, INC., JOHN CHIMINSKI, ALESSANDRO MASELLI, and THOMAS CASTELLANO,<br><br>Defendants. | Case No: 3:23-cv-01108-ZNQ-JTQ<br><br>Hon. Zahid N. Quraishi<br>District Judge<br><br>Hon. Justin T. Quinn<br>Magistrate Judge<br><br>Hearing Date: June 10, 2026 |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 6

I. THE SETTLEMENT WARRANTS FINAL APPROVAL ........ 6

A. Lead Plaintiffs and Co-Lead Counsel Have Adequately Represented the Settlement Class in this Action ........ 8

B. The Parties Negotiated the Settlement at Arm's Length with the Assistance of an Experienced Mediator ........ 11

C. The Settlement Provides the Settlement Class Adequate Relief, Considering the Costs, Risks, and Delay of Litigation and Other Relevant Factors ........ 12

1. The Complexity, Expense, and Likely Duration of the Litigation ........ 13

2. The Risks of Continued Litigation ........ 14

i. Risks to Establishing Liability ........ 15

ii. Risks to Establishing Loss Causation and Damages ........ 18

iii. Risks to Maintaining the Class Action Through Trial ........ 20

3. The Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation ........ 21

4. Stage of the Proceedings and Amount of Discovery Completed ........ 23

5. Ability of Defendants to Withstand a Greater Judgment ........ 24

6. The Reaction of the Settlement Class to Date ........ 25

7. The Relevant *Prudential* Factors Also Support the Settlement ........ 25

D. The Remaining Rule 23(e)(2) Factors Support Final Approval of the Settlement ....................26

II. THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION .......29

III. THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS.............32

IV. NOTICE SATISFIED RULE 23, DUE PROCESS, AND THE PSLRA .....32

CONCLUSION ....................34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alves v. Main*,
2012 WL 6043272 (D.N.J. Dec. 4, 2012), *aff'd*, 559 F. App'x. 151 (3d Cir. 2014) .......... 10, 11

*In re AT&T Corp. Sec. Litig.*,
455 F.3d 160 (3d Cir. 2006) .......... 21

*In re Baby Prods. Antitrust Litig.*,
708 F.3d 163 (3d Cir. 2013) .......... 33

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2011 WL 1585605 (S.D. Fla. Apr. 25, 2011), *aff'd on other grounds sub nom.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) .......... 14

*Beltran v. SOS Ltd.*,
2023 WL 319895 (D.N.J. Jan. 3, 2023) .......... 27, 29

*Beneli v. BCA Fin. Servs., Inc.*,
324 F.R.D. 89 (D.N.J. 2018) .......... 31

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) .......... 19, 23, 24, 25

*In re China Sunergy Sec. Litig.*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) .......... 22

*In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*,
795 F.3d 380 (3d Cir. 2015) .......... 9

*Dartell v. Tibet Pharms., Inc.*,
2017 WL 2815073 (D.N.J. June 29, 2017) .......... 24

*Devlin v. Ferrandino & Son, Inc.*,
2016 WL 7178338 (E.D. Pa. Dec. 9, 2016) .......... 23

*Ehrheart v. Verizon Wireless*,
609 F.3d 590 (3d Cir. 2010) ....................6

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)....................33

*Farrar v. Workhorse Grp., Inc.*,
2023 WL 5505981 (C.D. Cal. July 24, 2023)....................22

*Fernandez v. DouYu Int'l Holdings. Ltd.*,
2025 WL 3564643 (D.N.J. Dec. 15, 2025)....................6

*In re Gen. Instrument Sec. Litig.*,
209 F. Supp. 2d 423 (E.D. Pa. 2001)....................29, 30, 31

*Girsh v. Jepson*
521 F.2d 153, 157 (3d Cir. 1975) ....................7, 13, 14, 25

*Goodman v. UBS Fin. Servs. Inc.*,
2023 WL 8527165 (D.N.J. Dec. 7, 2023)....................34

*Hacker v. Elect. Last Mile Sols. Inc.*,
2024 WL 5102696 (D.N.J. Nov. 6, 2024) ....................34

*Hefler v. Wells Fargo & Co.*,
2018 WL 4207245 (N.D. Cal. Sept. 4, 2018)....................28

*In re Hemispherx Biopharma, Inc., Sec. Litig.*,
2011 WL 13380384 (E.D. Pa. Feb. 14, 2011) ....................22

*Howard v. Liquidity Servs. Inc.*,
2018 WL 4853898 (D.D.C. Oct. 5, 2018) ....................22

*In re Innocoll Holdings . Pub. Ltd. Co. Sec. Litig.*,
2022 WL 16533571 (E.D. Pa. Oct. 28, 2022) ....................34

*Lazy Oil, Co. v. Witco Corp.*,
95 F. Supp. 2d 290 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999) ....................19

*In re LinkedIn User Privacy Litig.*,
309 F.R.D. 573 (N.D. Cal. 2015)....................13

*In re Lucent Techs., Inc., Sec. Litig.*,
307 F. Supp. 2d 633 (D.N.J. 2004) ........................................................29

*McDonough v. Horizon Blue Cross Blue Shield of N.J.*,
641 F. App'x. 146 (3d Cir. 2015) ........................................................6

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)........................................................................33

*In re NFL Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) ........................................................6, 11

*In re Par Pharm. Sec. Litig.*,
2013 WL 3930091 (D.N.J. July 29, 2013) ..................................13, 21, 29

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998) ........................................................*passim*

*In re Schering-Plough Corp. Sec. Litig.*,
2009 WL 5218066 (D.N.J. Dec. 31, 2009)..............................................24

*Schuler v. Meds. Co.*,
2016 WL 3457218 (D.N.J. June 24, 2016)................................................3

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011) ........................................................20

*Talone v. Am. Osteopathic Ass'n*,
2018 WL 6318371 (D.N.J. Dec. 3, 2018)................................................13

*Utah Ret. Sys. v. Healthcare Servs. Grp., Inc.*,
2022 WL 118104 (E.D. Pa. Jan. 12, 2022)................................................9

*In re Valeant Pharms. Int'l, Inc. Sec. Litig.*,
2020 WL 3166456 (D.N.J. June 15, 2020)................................................7

*In re ViroPharma Inc. Sec. Litig.*,
2016 WL 312108 (E.D. Pa. Jan. 25, 2016)..........................................13, 17

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2017 WL 4167440 (E.D. Pa. Sept. 20, 2017)..........................................15

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) ....................6, 11, 24

*In re Wilmington Tr. Sec. Litig.*,
2018 WL 6046452 (D. Del. Nov. 19, 2018)....................7, 14, 22, 27

**Rules**

Fed. R. Civ. P. 23 .................... *passim*

Fed. R. Civ. P. 23(b)(3)....................20, 32

Fed. R. Civ. P. 23(2)(e)....................25

Fed. R. Civ. P. 23(c)(2)(B) ....................33

Fed. R. Civ. P. 23(e)(2)(A) ....................13

Fed. R. Civ. P. 23(e)(2)(C)(ii)....................27

Fed. R. Civ. P. 23 (e)(2)....................6, 7, 8, 26

Fed. R. Civ. P. 23 (e)(2)(C) ....................12

Fed. R. Civ. P. 23(e)(2)(C)(i)....................13

Fed. R. Civ. P. 23(e)(2)(C)(ii)....................27

Fed. R. Civ. P. 23(e)(2)(C)(iii) ....................27

Fed. R. Civ. P. 23(e)(2)(C)(iv)....................28

Fed. R. Civ. P. 23(e)(3)....................7

Fed. R. Civ. P. 23 (f) ....................14, 20

Court-appointed Lead Plaintiffs SEB Funds AB (f/k/a/ SEB Investment Management AB, "SEB") and Public Employees' Retirement System of Mississippi ("MPERS," and together with SEB, "Lead Plaintiffs" or "Plaintiffs"), on behalf of themselves and the proposed Settlement Class, respectfully submit this Memorandum of Law in support of their Motion, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rules"), for: (i) final approval of the proposed settlement of this securities class action ("Action") on the terms set forth in the Stipulation and Agreement of Settlement dated as of December 22, 2025 (ECF No. 151-1) ("Stipulation" or "Stip."), and (ii) approval of the proposed plan for allocating the net proceeds of the Settlement to the Settlement Class ("Plan of Allocation" or "Plan").[1]

## PRELIMINARY STATEMENT

Subject to Court approval, Lead Plaintiffs have agreed to settle all claims asserted in the Action for $78,000,000 in cash. The Settlement: (i) is the culmination of nearly three years of vigorous litigation; (ii) is the product of arm's-length settlement negotiations under the guidance of an experienced mediator and,

---

[1] All capitalized terms not defined herein have the meanings ascribed to them in the Stipulation or in the Joint Declaration of Joshua E. D'Ancona and Christine M. Fox ("Joint Declaration" or "Joint Decl."), filed herewith. Citations to "¶__" herein refer to paragraphs in the Joint Declaration and references to "Ex. _" are to exhibits to the Joint Declaration. Internal citations, quotation marks, and footnotes have been omitted, and emphasis has been added unless otherwise indicated.

ultimately, the Parties' acceptance of the mediator's recommendation to resolve the Action for the Settlement Amount; and (iii) represents more than 4.5 times the median federal securities class action settlement amount in 2025 and almost double the average settlement value.[2]

As described herein, the Settlement delivers a very favorable result for the Settlement Class in a case that presented serious risks of a lesser recovery, or none. At the time of settlement, the Parties were briefing a critical motion—Lead Plaintiffs' Motion for Class Certification ("Motion for Class Certification")—and Defendants had asserted various arguments against certification, including that: (i) Lead Plaintiffs could not satisfy Rule 23's predominance element, (ii) the sustained Quality Control and GAAP Compliance misstatements did not affect Catalent's stock price (*i.e.,* had no "price impact"), (iii) Lead Plaintiffs' methodology for measuring damages did not fit the asserted theory of liability, and (iv) Lead Plaintiffs were inadequate class representatives. ¶¶67-73, 98-99. These arguments, if accepted by the Court, could have defeated Lead Plaintiffs' motion and precluded a recovery for the Settlement Class. In contrast, through the Settlement, Lead Plaintiffs have secured a meaningful portion of the Settlement Class's potential recoverable

---

2 *See* Edward Flores, Svetlana Starykh and Ivelina Velikova, *Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review*, at 1 (NERA Economic Research Associates, Inc. 2026) (Ex. 3) ("NERA") (noting average settlement value in 2025 was $40 million and median settlement value was $17 million (an increase of 21% from 2024 and a 10-year high)).

damages—approximately 2.8% to 6.5%, based on various reasonable scenarios, as estimated by Plaintiffs' consulting damages expert—without the substantial risks and delay of continued litigation. ¶¶111-14.[3] Importantly, the Settlement is not "claims-made," and all proceeds, after deducting Court-approved fees and costs, will be distributed to eligible Settlement Class Members.

Over the course of the Action, Lead Plaintiffs and Co-Lead Counsel expeditiously pursued the Settlement Class's claims. Their efforts included, *inter alia*: (i) conducting a thorough investigation, including a detailed review of publicly available information, interviews with approximately 90 former Catalent employees, and consultation with experts; (ii) preparing a detailed amended complaint; (iii) opposing (and defeating, in part) Defendants' motion to dismiss; (iv) conducting substantial fact discovery, including obtaining and analyzing approximately 3.8 million pages of documents produced by Defendants and third parties, taking or defending 17 depositions, and obtaining and/or serving extensive written discovery, including interrogatories and requests for admission; (v) consulting with industry, accounting, and economic experts on merits and discovery issues; (vi) moving for

[3] According to NERA, for cases with total NERA-defined investor losses of between $1 billion and $4.999 billion, the median percentage of recovery from 2016 to 2025 was 1.3% of estimated losses. *See* Ex. 3 at 27; *see also Schuler v. Meds. Co.*, 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (recovery of 4% of estimated recoverable damages "falls squarely within the range of previous settlement approvals").

class certification (and preparing a response to Defendants' opposition at the time of settlement); and (vii) engaging in arm's-length settlement negotiations. ¶¶21-82. Through these efforts (and others), Lead Plaintiffs had a firm understanding of the strengths and weaknesses of the Settlement Class's claims, enabling them to fully evaluate the risks of continued litigation against an immediate recovery through settlement.[4]

While Lead Plaintiffs maintain that the Settlement Class's claims are meritorious, they also recognized that there were substantial risks to prosecuting their claims through the completion of discovery, a ruling on class certification, summary judgment, trial, and appeals that would likely follow any major orders. Aside from their challenges to class certification (as noted above), Defendants would continue to test Lead Plaintiffs' ability to prove liability as to the sustained Quality Control and GAAP Compliance misstatements as well as loss causation and damages for the corrective disclosures related to those misstatements and omissions. Joint Decl. §VII. In the face of these risks, Lead Plaintiffs determined that a certain, near-term $78 million recovery was in the best interests of the Settlement Class.

[4] The Joint Declaration is an integral part of this submission and, for the sake of brevity, Lead Plaintiffs respectfully refer the Court to the Joint Declaration for a full description of the history of the Action and Co-Lead Counsel's extensive litigation efforts; the Parties' settlement negotiations; and the risks of continued litigation.

In December 2025, the Court preliminarily approved the Settlement. ECF No. 152. The Settlement has the full support of SEB and MPERS—sophisticated institutional investors that took an active role in supervising the litigation—and the reaction of the Settlement Class to date has been positive. ¶121. While the May 20, 2026 deadline for objecting to the Settlement and Plan of Allocation has not yet passed, following the dissemination of 126,227 Postcard Notices to potential Settlement Class Members and nominees, publication of the Summary Notice online and in high-circulation media, and the availability of a dedicated case website,[5] not a single objection has been received. ¶121.

Given the foregoing considerations and the factors addressed below, Lead Plaintiffs respectfully submit that (i) the Settlement meets the standards for final approval under Rule 23, and is a fair, reasonable, and adequate result for the Settlement Class, and (ii) the proposed Plan of Allocation is a fair and reasonable method for equitably allocating the Net Settlement Fund to Settlement Class Members who submit valid Claims based on losses they suffered as a result of the alleged fraud.

---

[5] *See* Declaration of Morgan Kimball Regarding Notice Dissemination ("Mailing Decl.") on behalf of Epiq Class Action & Claims Solutions ("Epiq"), dated May 6, 2026, Ex. 4.

## ARGUMENT

### I. THE SETTLEMENT WARRANTS FINAL APPROVAL

Rule 23(e)(2) requires judicial approval of any class action settlement. Whether to grant such approval lies within the district court's discretion. *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004). In exercising this discretion, courts are guided by this Circuit's strong judicial policy favoring settlement, which "is especially strong in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 595 (3d Cir. 2010); *see also McDonough v. Horizon Blue Cross Blue Shield of N.J.*, 641 F. App'x. 146, 150 (3d Cir. 2015) (noting "overriding public interest in settling class action litigation"); *Fernandez v. DouYu Int'l Holdings. Ltd.*, 2025 WL 3564643, at *4 (D.N.J. Dec. 15, 2025) ("In this Circuit, settlements, particularly in the context of large class actions, are favored.").

Under Rule 23(e)(2), the Court should approve a proposed class action settlement if it finds it to be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see also In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 436 (3d Cir. 2016). In making this determination, Rule 23(e)(2) provides that a court should consider whether:

A. the class representatives and class counsel have adequately represented the class;

B. the proposal was negotiated at arm's length;
C. the relief provided for the class is adequate, taking into account:
(i) the costs, risks, and delay of trial and appeal;
(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
(iv) any agreement required to be identified under Rule 23(e)(3); and
D. the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Consistent with this guidance, courts in this Circuit have long considered the factors enumerated in *Girsh v. Jepson* in deciding whether to approve a class action settlement:

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation . . . .

521 F.2d 153, 157 (3d Cir. 1975) (ellipses in original); *In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at *4 (D. Del. Nov. 19, 2018).[6] The Third Circuit also advises courts to consider, where applicable, the additional factors set forth in *In re*

6 "These factors are a guide and the absence of one or more does not automatically render the settlement unfair." *In re Valeant Pharms. Int'l, Inc. Sec. Litig.*, 2020 WL 3166456, at *7 (D.N.J. June 15, 2020).

*Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998). *See infra* § I.C.7.[7]

At the preliminary approval stage, this Court considered the Rule 23(e)(2) factors in assessing the Settlement and found that it "[would] likely be able to approve the proposed Settlement as fair, reasonable, and adequate [], subject to further consideration at the Settlement Hearing." ECF No. 152, ¶1. Nothing has arisen that might alter the Court's previous findings, and the factors supporting its preliminary approval of the Settlement apply equally now. Lead Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate, and warrants final approval under the Rule 23(e)(2) factors and Third Circuit law.

### A. Lead Plaintiffs and Co-Lead Counsel Have Adequately Represented the Settlement Class in this Action

The first Rule 23(e)(2) factor—whether Lead Plaintiffs and Co-Lead Counsel "have adequately represented the class"—favors approval of the Settlement. The determination of adequacy "primarily examines two matters: the interests and

---

[7] The Advisory Committee Notes to the 2018 amendments to Rule 23 explain that the four Rule 23(e)(2) factors are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Accordingly, Lead Plaintiffs discuss below the fairness, reasonableness, and adequacy of the Settlement principally in relation to the four Rule 23(e)(2) factors, but also discusses the non-duplicative factors articulated by the Third Circuit in *Girsh* and *Prudential*.

incentives of the class representatives, and the experience and performance of class counsel." *In re Cmty. Bank of N. Va. Mortg. Lending Pracs. Litig.*, 795 F.3d 380, 392 (3d Cir. 2015).

SEB and MPERS are sophisticated institutional investors of the type that Congress, in passing the PSLRA, deemed appropriate to lead securities class actions. SEB and MPERS have actively pursued the Settlement Class's claims and provided valuable assistance to Co-Lead Counsel. *See* Declaration of Laken Ryals ("MPERS Decl.") (Ex. 1), ¶¶4-5; Declaration of Erik Sundgren on behalf of SEB ("SEB Decl.") (Ex. 2), ¶¶5-8, 16.

As set forth in their supporting declarations, both Lead Plaintiffs (through their employees and representatives) devoted considerable time and effort to the Action, including by communicating regularly with Co-Lead Counsel concerning significant case developments and strategy; reviewing and commenting on pleadings and briefs; responding to Defendants' discovery requests, including by searching for, collecting and producing documents; preparing for and providing testimony at depositions; and consulting with Co-Lead Counsel during settlement negotiations and ultimately approving the Settlement. *See* MPERS Decl., ¶¶5, 9-10; SEB Decl., ¶¶5-8. In addition, Lead Plaintiffs—whose claims are based on a common course of alleged wrongdoing by Defendants and are typical of other Settlement Class Members—have no interests antagonistic to the Settlement Class. *See Utah Ret. Sys.*

*v. Healthcare Servs. Grp., Inc.*, 2022 WL 118104, at *4 (E.D. Pa. Jan. 12, 2022) ("Plaintiff's interests are coextensive with, and not antagonistic to, the interests of the class since they all raise the same claims and seek the same relief: they share the same interest in holding Defendants accountable for their alleged misconduct.").

Lead Plaintiffs also retained counsel highly experienced in securities litigation (*see* Declaration on Behalf of Kessler Topaz Meltzer & Check, LLP in Support of Motion for Award of Attorneys' Fees and Litigation Expenses, Ex. 5-D (KTMC resume) and Declaration on Behalf of Labaton Keller Sucharow LLP in Support of Motion for Award of Attorneys' Fees and Litigation Expenses, Ex. 6-E (Labaton resume)), and Co-Lead Counsel vigorously litigated the Settlement Class's claims and negotiated the Settlement. *See Alves v. Main*, 2012 WL 6043272, at *22 (D.N.J. Dec. 4, 2012) ("[C]ourts in this Circuit 'traditionally attribute significant weight to the belief of experienced counsel that settlement is in the best interest of the class.'"), *aff'd*, 559 F. App'x. 151 (3d Cir. 2014). At the time of settlement, Co-Lead Counsel had undertaken a comprehensive investigation into the alleged fraud; drafted the detailed Complaint and defeated in part Defendants' motion to dismiss; conducted substantial fact discovery, including the analysis of approximately 3.8 million pages of documents and taking or defending 17 depositions; moved for class certification; engaged in significant mediation efforts; and expended the substantial time and financial resources necessary to successfully prosecute the Action. *See generally*

Joint Decl. And, perhaps most importantly, Co-Lead Counsel's efforts resulted in the $78 million recovery achieved for the Settlement Class.

### B. The Parties Negotiated the Settlement at Arm's Length with the Assistance of an Experienced Mediator

A presumption of fairness attaches to a settlement where, as here, the Parties engaged in arm's-length negotiations following years of litigation that included extensive discovery and consultation with multiple experts. *See, e.g.*, *NFL*, 821 F.3d at 436; *Warfarin*, 391 F.3d at 535, 537. This presumption is further supported where a neutral mediator is involved. *See Alves*, 2012 WL 6043272, at *22 ("The participation of an independent mediator in settlement negotiations 'virtually insures that the negotiations were conducted at arm's length and without collusion between the parties.'").

As directed by the Court, the Parties conferred and discussed points related to settlement prior to each of the several case management and status conferences held in 2024 and 2025. ¶74. However, it was not until significant progress into fact discovery had been made and Lead Plaintiffs' Motion for Class Certification was being briefed that the Parties began seriously discussing a possible resolution of the Action—agreeing on a private mediator and a date for mediation. ¶75. On November 19, 2025, the Parties participated in a full-day mediation in New York, NY with Mr. David Murphy, Esq. of Phillips ADR Enterprises. *Id.* Prior to the mediation, the Parties exchanged mediation briefing, supported by more than 100 exhibits

(including documents and deposition transcripts), and spoke directly with Mr. Murphy in the days and weeks leading up to the mediation. At the conclusion of the mediation, Mr. Murphy issued a proposal to settle the Action for $78 million, which both sides accepted through a double-blind process on November 21, 2025. *Id.*

Having prosecuted the Action for nearly three years, including through substantial discovery efforts and class certification briefing, Lead Plaintiffs possessed a thorough understanding of the strengths and weaknesses of the case, as well as the value of the Settlement Class's claims and the propriety of settlement. The Parties' submissions to the mediator and negotiations, including an in-person session attended by representatives from both sides and Defendants' insurance carriers, further informed Plaintiffs of the strength of each side's arguments. ¶¶76-78; *see* 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 13:49 (6th ed. 2024) (approval warranted "[w]here a court can conclude that the parties had sufficient information to make an informed decision about settlement").

### C. The Settlement Provides the Settlement Class Adequate Relief, Considering the Costs, Risks, and Delay of Litigation and Other Relevant Factors

Rule 23(e)(2)(C) overlaps considerably with many of the factors articulated in *Girsh*. All of these factors, which entail "a substantive review of the terms of the proposed settlement" and the "relief that the settlement is expected to provide to"

the Settlement Class, weigh in favor of the Settlement. *See* Fed. R. Civ. P. 23(e)(2)(A) & (B) Advisory Committee's note to 2018 amendment.

### 1. The Complexity, Expense, and Likely Duration of the Litigation

Rule 23(e)(2)(C)(i) and the first *Girsh* factor look to "the complexity, expense and likely duration of the litigation." *Girsh*, 521 F.2d at 157. "This factor is intended to capture the probable costs, in both time and money, of continued litigation." *In re ViroPharma Inc. Sec. Litig.*, 2016 WL 312108, at *9 (E.D. Pa. Jan. 25, 2016). Indeed, settlement is favored where "[C]ontinuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial." *Talone v. Am. Osteopathic Ass'n*, 2018 WL 6318371, at *14 (D.N.J. Dec. 3, 2018); *see also In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

Courts consistently acknowledge that securities class actions are "notably complex, lengthy, and expensive cases to litigate" *In re Par Pharm. Sec. Litig.*, 2013 WL 3930091, at *4 (D.N.J. July 29, 2013). This case was no exception, and continued litigation presented numerous risks to Lead Plaintiffs' ability to establish liability and damages. ¶¶94-116. Further, additional litigation—through the completion of fact discovery (including up to eleven more depositions), a ruling on

Lead Plaintiffs' Motion for Class Certification and if granted, a possible Rule 23(f) interlocutory appeal, expert discovery, summary judgment, and trial—would have required substantial additional time and expense.[8] The Settlement, on the other hand, avoids the risk, expense, and delay of continued litigation while providing a substantial, near-term recovery for the Settlement Class.

### 2. The Risks of Continued Litigation

In assessing a settlement, a court should also consider "the risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial." *Girsh*, 521 F.2d at 157. "These [*Girsh*] factors 'balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of immediate settlement.'" *Wilmington Tr.*, 2018 WL 6046452, at *5.

Although Lead Plaintiffs and Co-Lead Counsel believe that the Settlement Class's claims are meritorious, they acknowledge that, absent settlement, Defendants would continue to advance formidable arguments that threatened to

---

[8] Even if Lead Plaintiffs prevailed at trial, Defendants likely would have appealed the verdict. Post-trial motions and appellate proceedings would have added significantly to the expense of this Action and delayed—potentially for years—any recovery for the Settlement Class (with no assurance that Lead Plaintiffs would ultimately prevail or recover more than the Settlement Amount). *See, e.g.*, *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605, at *1 (S.D. Fla. Apr. 25, 2011) (granting defendants judgment as a matter of law on basis of loss causation, overturning jury verdict and award in plaintiff's favor), *aff'd on other grounds sub nom.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012).

reduce or eliminate any recovery for Catalent investors. *See generally W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2017 WL 4167440, at *5-6 (E.D. Pa. Sept. 20, 2017) (approving settlement where "[e]stablishing liability would be difficult for the Class [and] [e]stablishing damages would also be no picnic").

**i. Risks to Establishing Liability**

Absent a resolution through settlement, Lead Plaintiffs faced several substantial risks to establishing liability—particularly as to the Rule 10b-5 elements of falsity and scienter.

*First*, at summary judgment and trial, Defendants would likely argue (as they had throughout the litigation) that Lead Plaintiffs could not demonstrate that any of the sustained misstatements were materially false or misleading. With respect to the Quality Control misstatements, Defendants would argue that there was no proof of falsity because (according to them) (i) Catalent had already disclosed sufficient information to investors regarding the alleged quality and regulatory setbacks that support the claim, and (ii) Defendants reasonably deemed their facilities to be compliant with applicable standards. As such, Defendants would assert that the alleged truth was not actually concealed from the market, their statements did not materially misrepresent anything, and they had no duty to disclose more. ¶¶101-105.

To take one particular example, Defendants would assert that the sustained February 2022 misstatements regarding quality issues and a shutdown at Catalent's

Brussels manufacturing facility were not actionable on the grounds that investors already knew that the shutdown was impacting Catalent's revenue performance, pointing to prior disclosures by Defendants that (they would claim) had adequately apprised the market and satisfied any duty to disclose. While Lead Plaintiffs, in contrast, claimed that the February 2022 statements materially downplayed the extent of the revenue and reputational impact from an extended shutdown of the Brussels facility and thus misled investors. This factual dispute would be challenging for Lead Plaintiffs to win, as it would turn on interpretations—by the Court and eventually the jury—of internal Catalent documents and the testimony of current Catalent employee-witnesses who might be expected to view events in a light favorable to Catalent. *Id.*[9]

The falsity of both the alleged Quality Control and GAAP Compliance misstatements would be difficult to prove for the additional reason that they would likely depend on evidence regarding Catalent's reliance on professional judgments about technical quality and accounting issues.. For example, Lead Plaintiffs' GAAP claim was not that Catalent had outright falsified its financials, but that it had utilized materially deficient internal controls that yielded faulty results and were

[9] Similar challenges of proof would confront Lead Plaintiffs in attempting to show the falsity of the other Quality Control misstatements, which likewise implicated matters of degree—whether Defendants' limited disclosures about the underlying issues sufficed or required more.

misrepresented in Defendants' public certifications. Accordingly, falsity would hinge on the reasonableness of the decisions and actions Catalent took regarding these technical matters, an issue that would likely not be clear-cut but rather subject to interpretation by the Parties' respective expert witnesses. ¶¶101-105. Potentially lending credence to Defendants' version of events, many of the fact witnesses who would testify on these issues and who authored the relevant documents were still Catalent employees when the Settlement was reached, and they would likely defend their words and deeds. In sum, proving falsity would be a steep climb.

*Second*, Lead Plaintiffs would be challenged to prove Defendants' scienter. *See, e.g.*, *ViroPharma*, 2016 WL 312108, at *12 ("Since stockholders normally have 'little more than circumstantial … evidence to establish the requisite scienter, proving scienter is an uncertain and difficult necessity for plaintiffs.'"). Absent a settlement, Defendants would continue to argue that they did not have a culpable state of mind when making the Quality Control misstatements, but that they believed they had disclosed sufficient information to investors about a complex and constantly shifting circumstance, based on reliable internal subject-matter experts and processes, so as not to mislead. Regarding the GAAP Compliance misstatements, Defendants would argue that they relied on accounting and internal control processes they considered adequate, and which Catalent's outside auditor had not deemed problematic. The chief witnesses on scienter would be the individual

Defendants themselves—charismatic corporate executives who might successfully persuade the factfinder that, despite their ultimate failure to contain the issues and prevent shareholder losses, they genuinely did their best to fulfill their duties. ¶¶106-110. Lead Plaintiffs would likely have to rely on cross examination alone to undermine such testimony.

**ii. Risks to Establishing Loss Causation and Damages**

Lead Plaintiffs also faced considerable challenges with respect to establishing damages and the related Rule 10b-5 element of loss causation. Indeed, Defendants were expected to mount substantial attacks on Lead Plaintiffs' theory that the alleged fraud was revealed through six partial corrective disclosures between September 2022 and May 2023, damaging investors. ¶¶111-116.

For example, Defendants would argue that many, if not all, of the corrective disclosures did not directly refer or relate to the alleged false and misleading statements, and that analysts and others in the market arguably did not interpret them as substantively tied to the prior misstatements. Instead, the disclosures merely told the market of negative developments that had occurred in Catalent's business in the ordinary course. As a result (Defendants would contend), the declines in Catalent's stock price that followed those disclosures could neither be attributed to the revelation of any fraud, nor serve as a basis for measuring damages. If this argument

prevailed, Lead Plaintiffs would be unable to prove damages from the misstatements, even if they proved falsity and scienter.

As a secondary position, Defendants would argue that even if one or more of the alleged corrective disclosures could be tied back to an earlier misstatement, other, non-fraud-related information released at the same time was responsible for a significant portion of the Catalent stock price decline following the disclosure. As such (they would contend), only some fraction of the overall stock drop in question could possibly be related to investor damages, and the rest would have to be disaggregated and excluded from the calculation. This argument, to the extent it was accepted, would risk limiting damages, even if liability and causation were shown. *Id*.

Such issues of damages and loss causation (i.e., the relationship of the alleged corrective disclosures to the fraud and the extent of any confounding information requiring disaggregation) would be determined at summary judgment and trial largely through economic expert witness testimony. Thus, "establishing damages at trial would lead to a battle of experts . . . with no guarantee whom the jury would believe." *In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001); *see also Lazy Oil, Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) ("[C]ourts have recognized the need for compromise where divergent testimony would render the

litigation an expensive and complicated 'battle of experts.'"), *aff'd*, 166 F.3d 581 (3d Cir. 1999).

**iii. Risks to Maintaining the Class Action Through Trial**

Class certification presented another meaningful litigation risk. As an initial matter, Lead Plaintiffs faced the prospect of losing their Motion for Class Certification, which was not yet fully briefed at the time the Settlement was reached. Defendants' primary argument in opposition was that Lead Plaintiffs could not satisfy the predominance element of Rule 23(b)(3) because Defendants had proved that the alleged misstatements had no effect on Catalent's stock price. While Lead Plaintiffs intended to strenuously oppose this argument, it would—like the related issues of loss causation and damages—turn on the Court's view of the reports and testimony of the Parties' economic expert witnesses, i.e., an uncertain battle of the experts. ¶98-99.

If the Court granted certification, Lead Plaintiffs would confront continued risks to maintaining the Action as a class action through trial. A main threat in this regard is the likelihood that Defendants would attempt to appeal and undo a certification order pursuant to Rule 23(f). Failing that, Defendants would remain free to move for decertification up through trial, which could result in a truncated class, or disbandment of the class altogether. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273,

322 (3d Cir. 2011) ("district court retains the authority to decertify or modify a class at any time during the litigation").

The foregoing risks to continued litigation strongly support the Court's approval of the Settlement.

### 3. The Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and the Risks of Litigation

The eighth and ninth *Girsh* factors, typically considered in tandem, examine "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential*, 148 F.3d at 322. "In making this assessment, the Court compares the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, with the amount of the proposed settlement." *Par Pharm.*, 2013 WL 3930091, at *7; *see also In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 170 (3d Cir. 2006) ("the percentage recovery[] must represent a material percentage recovery to plaintiff in light of all the risks"). The $78 million Settlement clears this threshold.

Here, the Settlement is a favorable result for the Settlement Class, providing a near-term cash benefit to the Settlement Class and eliminating the substantial risk that the Settlement Class could recover less, or nothing at all, if the Action continued. The Settlement also represents a meaningful portion—approximately 2.8% to 6.5%—of the Settlement Class's potential recoverable damages ranging from $1.2 billion to $2.8 billion as calculated by Lead Plaintiffs' consulting damages expert

based on various scenarios. ¶¶112-114. While each securities class action has its own unique risks, the recovery obtained here compares favorably to recoveries achieved in other securities cases and approved by courts. *See Wilmington Tr.*, 2018 WL 6046452, at *8 (noting "Third Circuit median recovery of 5% of damages in class action securities litigation"); *Farrar v. Workhorse Grp., Inc.*, 2023 WL 5505981, at *7 (C.D. Cal. July 24, 2023) ("a 3% recovery is within the range of the percentages of recovery approved in other securities class action settlements"); *Howard v. Liquidity Servs. Inc.*, 2018 WL 4853898, at *5 (D.D.C. Oct. 5, 2018) (approving securities class action settlement "constitut[ing] approximately 4% of the ***maximum*** realistic recoverable damages") (emphasis in original); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting average settlements "have ranged from 3% to 7% of the class members' estimated losses"); *In re Hemispherx Biopharma, Inc., Sec. Litig.*, 2011 WL 13380384, at *6 (E.D. Pa. Feb. 14, 2011) (approving settlement representing 5.2% of maximum damages and finding it "falls squarely within the range of reasonableness approved in other securities class action settlements").[10] Moreover, the adequacy of the Settlement Amount is reinforced by the fact that it was proposed by Mr. Murphy during the mediation process.

---

[10] In addition, the Settlement is more than 4.5 times the median securities class action settlement in the Third Circuit in 2025 ($17 million).

Considered against the many risks to continued litigation, the Settlement Amount is fair, reasonable, and adequate.

#### 4. Stage of the Proceedings and Amount of Discovery Completed

The third *Girsh* factor requires a court to consider "the degree of case development that class counsel have accomplished prior to settlement" in order to "determine whether counsel had an adequate appreciation of the merits of the case before negotiating" the settlement. *Cendant*, 264 F.3d at 235. A settlement following sufficient discovery and arms-length negotiation is "presumptively valid." *Devlin v. Ferrandino & Son, Inc.*, 2016 WL 7178338, at *5 (E.D. Pa. Dec. 9, 2016) (settlement "generally recognize[d]" as "presumptively valid where . . .the parties engaged in arm's length negotiations after meaningful discovery").

From the commencement of this Action in February 2023 through its resolution in December 2025, Lead Plaintiffs and Co-Lead Counsel spent extensive time and resources prosecuting the Settlement Class's claims. *See generally* Joint Decl.As noted above, before reaching the Settlement, Co-Lead Counsel had opposed and defeated in part Defendants' motion to dismiss the Complaint, completed substantial fact discovery, including the analysis of approximately 3.8 million pages of documents and participating in 17 depositions, and moved for class certification. In addition, Co-Lead Counsel prepared detailed mediation submissions and participated in serious settlement negotiations, including an all day, in-person

mediation. This record demonstrates that, when the Parties reached the Settlement, Lead Plaintiffs and Co-Lead Counsel had ample information to make an informed decision about settlement based on the "strengths and weaknesses of their case." *Dartell v. Tibet Pharms., Inc.*, 2017 WL 2815073, at *5 (D.N.J. June 29, 2017) (finding third *Girsh* factor favored settlement approval where parties had "fully briefed motions to dismiss, a motion for class certification, and [had] engaged in discovery," as well as the "engage[ment of] two experts"). This factor strongly supports the Settlement.

**5. Ability of Defendants to Withstand a Greater Judgment**

The seventh *Girsh* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *Cendant*, 264 F.3d at 240. However, even the "fact that [defendants] could afford to pay more does not mean that [they are] obligated to pay any more than what the . . . class members are entitled to under the theories of liability that existed at the time the settlement was reached." *Warfarin*, 391 F.3d at 538. Here, while Defendants theoretically could afford to pay more, this factor does not render the significant amount recovered through the Settlement any less fair, reasonable, or adequate. *See In re Schering-Plough Corp. Sec. Litig.*, 2009 WL 5218066, at *5 (D.N.J. Dec. 31, 2009) ("pushing for more in the face of risks and delay would not be in the interests of the class").

#### 6. The Reaction of the Settlement Class to Date

In assessing a settlement, courts in this Circuit also consider "the reaction of the class to the settlement." *Girsh*, 521 F.2d at 157. Moreover, "[a] vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption . . . in favor of the Settlement"). *Cendant*, 264 F.3d at 235. The deadline to object to the Settlement is May 20, 2026. To date, there have been no objections. ¶121. Moreover, Lead Plaintiffs strongly support the Settlement. MPERS Decl., ¶6; SEB Decl., ¶9.

#### 7. The Relevant *Prudential* Factors Also Support the Settlement

In addition to Rule 23(2)(e) and the traditional *Girsh* factors, the Third Circuit also advises courts to address, where applicable, the following factors set forth in *Prudential*:

> [1] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

148 F.3d at 323. Each of the *Prudential* factors weighs in favor of the Settlement.

As to the first *Prudential* factor, Lead Plaintiffs and Co-Lead Counsel had a well-developed understanding of the strengths and weaknesses of the case based on their thorough investigation and prosecution of the Settlement Class's claims, work with multiple experts, motion practice, substantial merits discovery, and mediation efforts. *See supra* § I.C.4.

As to the second and third *Prudential* factors, Lead Plaintiffs are not aware of other classes or claimants asserting related securities fraud claims.

As to the fourth *Prudential* factor, the notices advise that Settlement Class Members may request exclusion from the Settlement Class by May 20, 2026. To date, not one request for exclusion has been received.

As to the fifth and sixth *Prudential* factors, Co-Lead Counsel's request for attorneys' fees is reasonable as set forth in the accompanying Fee and Expense Memorandum. The proposed Plan that will govern the allocation of the Net Settlement Fund to Settlement Class Members is also fair and reasonable as set forth below in § II.

### D. The Remaining Rule 23(e)(2) Factors Support Final Approval of the Settlement

In evaluating the Settlement, Rule 23(e)(2) instructs courts to also consider: (i) "the effectiveness of [the] proposed method of distributing the relief provided to the class, including the method of processing class member claims"; (ii) "the terms of any proposed award of attorney's fees, including the timing of payment"; (iii) any

other agreement made in connection with the proposed settlement; and (iv) whether "class members are treated equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(C)(ii)-(iv) & (e)(2)(D). These factors also support final approval.

*First*, the proposed method of distribution and claims processing ensures equitable treatment of Settlement Class Members. *See* Rule 23(e)(2)(C)(ii), (e)(2)(D). Claims will be processed and the Net Settlement Fund distributed pursuant to a standard method routinely approved in securities class actions. Epiq will process all Claims, provide Claimants with an opportunity to cure any deficiency or request judicial review of any denial, if applicable, and will ultimately mail/wire Authorized Claimants their *pro rata* share of the Net Settlement Fund, as calculated under the Plan. None of the Settlement proceeds will revert to Defendants. *See* Stip., ¶12.

*Second*, the Settlement Amount remains adequate upon consideration of the proposed award of attorneys' fees and expenses, including the timing of payment. *See* Rule 23(e)(2)(C)(iii). The requested 25% fee reflects Co-Lead Counsel's efforts over the past three years, and the successful result achieved for the Settlement Class. Additionally, the 25% fee request is fully supported by Third Circuit case law. *See Wilmington Tr.*, 2018 WL 6046452, at *9 (finding 28% to be a "typical fee percentage" in the Third Circuit); *see also Beltran v. SOS Ltd.*, 2023 WL 319895, at *8 (D.N.J. Jan. 3, 2023) ("In common fund cases, the fees typically awarded to class counsel generally range between 19% and 45% of the Settlement Fund."), *Rep. &*

*Recommendation adopted*, 2023 WL 316294 (D.N.J. Jan. 19, 2023).[11] Further, the proposal that any Court-awarded fees be paid upon issuance of the ruling granting such fees is also reasonable and consistent with common practice, as the Stipulation dictates that if the Settlement is terminated or any fee award subsequently modified, Co-Lead Counsel must repay the subject amount with interest. Stip., ¶15.

*Lastly*, as previously disclosed, the confidential Supplemental Agreement Regarding Requests for Exclusion ("Supplemental Agreement") is the only agreement in addition to the Term Sheet and the Stipulation entered into by the Parties in connection with the Settlement. *See* Stip., ¶41; *see also* Rule 23(e)(2)(C)(iv). The Supplemental Agreement provides Catalent with the option to terminate the Settlement in the event requests for exclusion exceed certain agreed-upon criteria. Stip., ¶41. This type of agreement is standard in securities class actions and has no negative impact on the fairness of the Settlement. *See, e.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *11 (N.D. Cal. Sept. 4, 2018) ("The existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair.").

---

[11] In connection with their fee request, Co-Lead Counsel also seek payment from the Settlement Fund of Plaintiffs' Counsel's expenses in the total amount of $1,563,187.27 and request reimbursement to Lead Plaintiffs in the aggregate amount of $57,323.00. ¶¶160, 171.

## II. THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

"Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable and adequate." *Beltran*, 2023 WL 319895, at *9. An allocation formula recommended by experienced and competent class counsel "need only have a reasonable and rational basis." *Par Pharm.*, 2013 WL 3930091, at *8. Moreover, "[a] plan of allocation that reimburses class members based on the type and extent of their injuries [relative to strength and value of their claims] is generally reasonable." *In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 649 (D.N.J. 2004); *see also In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 431 (E.D. Pa. 2001) (deeming plan of allocation "even handed" where "claimants are to be reimbursed on a *pro rata* basis for their recognized losses based largely on when they bought and sold their shares of [eligible] stock").

Here, the Plan (set forth in full in the Notice) was developed by Co-Lead Counsel in consultation with Lead Plaintiffs' consulting damages expert, Chad Coffman CFA and his team at Peregrine Economics. ¶¶123-130. The Plan is designed to equitably distribute the Net Settlement Fund to Settlement Class Members who timely submit valid Claims demonstrating that they suffered economic losses as a result of the alleged violations of the federal securities law with respect to their Catalent Securities. *Id.*

In developing the Plan, Mr. Coffman calculated the estimated amount of alleged artificial inflation or deflation in the per-share closing prices of Catalent publicly traded common stock, the exchange-traded call options of Catalent, and the exchange-traded put options of Catalent (collectively, "Catalent Securities") that allegedly was proximately caused by Defendants' alleged materially false or misleading statements and omissions. To qualify for a loss under the Plan, a Settlement Class Member must have held Catalent common stock or call options purchased/acquired during the Class Period through one of the alleged partial corrective disclosures on September 20, 2022, November 1, 2022, December 8, 2022, April 14, 2023, and May 8, 2023, that removed the artificial inflation from the price of Catalent common stock or call options. Likewise, with respect to Catalent put options, a Settlement Class Member must have sold (written) those options during the Class Period, and such option(s) must have remained open through at least one of the partial alleged corrective disclosures, that allegedly removed the artificial deflation from the price of Catalent put options. *Id.* Further, a Claimant's loss will depend upon several factors, including what Catalent Securities the Claimant purchased/acquired/sold and the date(s) when the Claimant purchased/acquired/sold their Catalent Securities during the Class Period and at what price(s). ¶¶123-130. For Catalent common stock, the Plan also takes into account the PSLRA's statutory limitation on recoverable damages. *Id.* Authorized Claimants will recover their

proportional "*pro rata*" amount of the Net Settlement Fund based on their calculated loss. *Id.*; *see Beneli v. BCA Fin. Servs., Inc.*, 324 F.R.D. 89, 105 (D.N.J. 2018) ("[P]ro rata distributions are consistently upheld . . . .").[12] Lead Plaintiffs' trading activity will be treated in the same manner.

After the Settlement reaches its Effective Date (Stip. at ¶26) and the claims process is completed, Authorized Claimants will be issued payments in the form of checks and wire transfers. If there are unclaimed funds after the initial distribution, and it would be cost-effective to conduct a further distribution, the Claims Administrator will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. Thereafter, Lead Plaintiffs recommend that any *de minimis* balance that remains in the Net Settlement Fund, after payment of any outstanding Notice and Administration Expenses and

---

[12] Under the Plan, the Settlement proceeds available for Catalent call options purchased/acquired during the Class Period and Catalent put options sold (written) during the Class Period are limited to a total amount up to 2% of the Net Settlement Fund—the approximate percentage options damages represent of total damages. If the cumulative Recognized Loss Amounts for Catalent call options and Catalent put options exceeds 2% of all Recognized Claims, then the Recognized Loss Amounts calculated for options transactions will be reduced proportionately until they collectively equal 2% of all Recognized Claims. In the unlikely event that the Net Settlement Fund is sufficient to pay 100% of the Catalent common stock-based claims, any excess amount will be used to pay the balance on the remaining option-based claims. *Id.*

Taxes, be donated to a non-profit, non-sectarian 501(c) organization designated by Lead Plaintiffs and approved by the Court. *Id* at ¶27.

It is respectfully submitted that the Plan will result in a fair and equitable distribution of the Settlement proceeds among Settlement Class Members who suffered losses as a result of Defendants' alleged conduct. The Notice fully disclosed the Plan and, to date, no objections to the Plan have been received. Therefore, the Plan should be approved.

## III. THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

As set forth in Lead Plaintiffs' preliminary approval motion (ECF No. 150), the Settlement Class satisfies all of the requirements of Rules 23(a) and (b)(3). *See also* Preliminary Approval Order, ¶¶1-2 (preliminarily certifying the Settlement Class for purposes of settlement and noting the Court "will likely be able to [] certify the proposed Settlement Class"). None of the facts supporting certification of the Settlement Class have changed. Accordingly, Lead Plaintiffs respectfully request that the Court certify the Settlement Class under Rules 23(a) and (b)(3) for purposes of effectuating the Settlement.

## IV. NOTICE SATISFIED RULE 23, DUE PROCESS, AND THE PSLRA

Lead Plaintiffs have provided the Settlement Class with adequate notice of the Settlement. The notice satisfied both: (i) Rule 23, as it was "the best notice . . . practicable under the circumstances" and directed "in a reasonable manner to all

class members who would be bound by the" Settlement (Fed. R. Civ. P. 23(c)(2)(B) & (e)(1)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974)); and (ii) due process, as it was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950); *see also In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013) ("Generally speaking, the notice should contain sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class."). Collectively, the notices to the Settlement Class provide all information required by Rule 23 and the PSLRA. *See* ECF No. 152, ¶7; *see also* Mailing Decl., Ex. 4-C.

In accordance with the Preliminary Approval Order, Epiq has disseminated a total of 126,227 Postcard Notices to potential Settlement Class Members and nominees. Ex. 4-C, ¶13. In addition, Epiq caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on January 20, 2026, and established and maintains the website www.CatalentSecuritieSettlement.com to provide information about the Settlement and access to downloadable copies of the Notice and Claim Form and other Settlement-related documents. *Id.*, ¶¶15-18.

In sum, the notice campaign provides sufficient information for Settlement Class Members to make informed decisions regarding the Settlement, fairly apprises them of their rights with respect to it, represents the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Rule 23, the PSLRA, and due process. Courts in this Circuit routinely approve comparable notice programs. *See, e.g.*, *Hacker v. Elect. Last Mile Sols. Inc.*, 2024 WL 5102696, at *12 (D.N.J. Nov. 6, 2024); *Goodman v. UBS Fin. Servs. Inc.*, 2023 WL 8527165, at *2 (D.N.J. Dec. 7, 2023); *In re Innocoll Holdings . Pub. Ltd. Co. Sec. Litig.*, 2022 WL 16533571, at *2-4 (E.D. Pa. Oct. 28, 2022).

## CONCLUSION

For the reasons set forth herein and in the accompanying Joint Declaration, Lead Plaintiffs respectfully request that the Court grant final approval of the Settlement and approve the proposed Plan of Allocation. Proposed orders will be submitted with Lead Plaintiffs' reply papers, after the objection and exclusion deadline has passed.

Dated: May 6, 2026

Respectfully submitted,

*/s/ Joseph N. Cotilletta*

**LABATON KELLER SUCHAROW LLP**
Christine M. Fox (*pro hac vice*)
Joseph N. Cotilletta
Adam M. Federer (*pro hac vice*)
Emily N. Gault (*pro hac vice*)
140 Broadway
New York, NY 10005

Telephone: (212) 907-0700
cfox@labaton.com
jcotilletta@labaton.com
afederer@labaton.com
egault@labaton.com

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Joshua E. D'Ancona
Matthew L. Mustokoff (*pro hac vice)*
Jamie M. McCall *(pro hac vice)*
David A. Bocian
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
jdancona@ktmc.com
mmustokoff@ktmc.com
jmccall@ktmc.com
dbocian@ktmc.com

*Co-Lead Counsel for Lead Plaintiffs SEB Funds AB and Public Employees' Retirement System of Mississippi, and Proposed Settlement Class*

**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
James E. Cecchi
Michael A. Innes
Kevin G. Cooper
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com
minnes@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Settlement Class*

**DAVIDSON BOWIE, PLLC**
John L. Davidson (*pro hac vice*)
1062 Highland Colony Parkway
200 Concourse, Suite 275

Ridgeland, MS 39157
Telephone: (601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi*